IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ROY JONES, ALICE JONES, Individually, LEQUETTA DAVIS as Next Friend to QUINTERO JONES, JR., as Heirs-at-law to QUINTERO DEVALE JONES, | § § § § § § | |
| Plaintiffs, | § § | |
| | § | **CIVIL ACTION No. _____** |
| v. | § § | |
| BRAD LIVINGSTON, MATT BARBER, JOE A. GRIMES, ROBERT EASON, C.O. MARTHA BARRERA, C.O. GARZA, C.O. MAYER, DR. LANNETTE LINTHICUM, and DR. OWEN MURRAY, in their individual capacities, the TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and the UNIVERSITY OF TEXAS MEDICAL BRANCH, | § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

TO THE HONORABLE COURT:

COME NOW, Plaintiffs ROY JONES, ALICE JONES, Individually, and LEQUETTA DAVIS as Next Friend to QUINTERO JONES, JR., as Heirs-at-Law to QUINTERO DEVALE JONES, and file this Original Complaint.

Quintero Jones was an asthmatic with high blood pressure who died in Texas Department of Criminal Justice custody because Defendants' Texas corrections officials took away his emergency breather and then placed him in lethally hot conditions in the TDCJ McConnell Unit (or "McConnell" Unit) through their repeated willful and wonton indifference to undeniable

dangers of their own making. Mr. Jones parents Alice and Roy Jones as well as his son Quintero Jones, Jr. by and through his mother and Next Friend, LeQuetta Davis, sue for redress for the untimely death of Quintero Jones. All of the Plaintiffs reside in Dallas County Texas.

## STATEMENT OF CLAIMS

1.    Prisoners have been dying of heat related conditions while in Defendants' custody at prisons across Texas for a number of years.

2.    The statutory heirs at law one of these men, Quintero Jones, brings claims arising out of the wrongful death of Quintero Jones.

3.    Plaintiffs claim the individual Defendants are liable under 42 U.S.C. §1983 for violating Jones's constitutional rights under color of law, in violation of his Eighth and Fourteenth Amendment right to protection from cruel and unusual punishment.

4.    Plaintiffs further claim TDCJ and the University of Texas Medical Branch caused Jones's death by failing to provide reasonable accommodations for his disabilities, in violation of Title II of the Americans with Disabilities Act ("ADA"), and the Americans with Disabilities Act Amendments Act ("ADAAA"), 42 U.S.C. § 12131, et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act").

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), §1343 (civil rights), and §2201 (Declaratory Judgment Act).   The Court has supplemental jurisdiction over state law claims.

6.    Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1), because the TDCJ is headquartered in this District and all Defendants reside in this state.

## PARTIES

7.     Plaintiffs Roy Jones and Alice Jones, are the parents of Quintero Jones, deceased and hereby bring this their claim under the Texas Wrongful death statute Tex. C. Prac. & Rem. Code § 71.004(a) for the wrongful death of Quintero Devale Jones as well as a claim under the Texas Survival of cause of Action Tex. Civ. Prac. & Rem. Code § 71.021 as heir to their son's body. There is no administration of Quintero Jones estate pending and none is necessary.

8.     Plaintiff LeQuetta Davis, as next Friend to her minor son Quintero Jones, Jr. an heir to Quintero Jones, makes a claim under the Texas Wrongful death statute Tex. C. Prac. & Rem. Code § 71.004(a) for the wrongful death of Quintero Jones as well as under Texas Survival of Cause of Action Tex. Civ. Prac. & Rem. Code § 71.021.  There is no administration of Quintero Jones estate pending and none is necessary.

9.     Defendant Brad Livingston was the predecessor to Bryan Collier, the current Executive Director of the Texas Department of Criminal Justice (TDCJ). As such, Livingston was at all relevant times the Commanding Officer of all TDCJ correctional officers, guards, and TDCJ employees and contractors, and is responsible for their training, supervision, and conduct. By law, he was responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Livingston was acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for nominal, punitive, and compensatory damages.

10.     Defendant Matt Barber was the Senior Warden at the McConnell Unit at all relevant times. At all relevant times, Barber was acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for nominal, punitive, declaratory, and compensatory relief.

11.     Defendant Robert Eason is the Director of TDCJ's Correctional Institutions Division. As such, Eason is the Direct Supervisor of all TDCJ correctional officers, guards, and TDCJ employees and contractors working in TDCJ's prisons, and is responsible for their training, supervision, and conduct in all Institutional Division facilities. By law, he is responsible for protecting the constitutional rights of all persons held in TDCJ custody. At all relevant times, Eason was acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Eason is a resident of McConnell, Texas, in Walker County. He can be served with process at 726 Overbrook, Huntsville, TX 77340.

12.     Defendant Joe A. Grimes was the Regional Director for TDCJ's "Region IV," and supervises twenty-three prisons, including the McConnell Unit. As the Regional Director, he is responsible for the supervision of all personnel at the McConnell Unit. Grimes was acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages. Grimes is a resident of Bee County, Texas and should be served with summons at his place of business Texas Department of Criminal Justice Region IV Director's Office, 965 Ofstie Street, Beeville, TX 78102-8986.

13.     Dr. Owen Murray is the Chief Physician executive for UTMB's correctional managed care program and oversees the medical, mental health and dental services provided to prisoners within more than 100 units in the Texas Department of Criminal Justice served by UTMB, including the McConnell Unit. Dr. Murray oversees program development, quality assurance, outcomes management, the pharmaceutical formulary, disease management guidelines, offender correspondence, peer review, litigation coordination, financial management, business

development, continuing medical education, and staff recruitment and development. He is sued in his individual capacity for punitive and compensatory damages.  He can be served at his place of work at: UTMB, 301 University Blvd., Administration Building, Galveston, TX 77555-1006.

14.     Dr. Lannette Linthicum is the Director of TDCJ's Health Services Division. She is responsible for supervision of all medical care providers at all TDCJ facilities. She supervises provision of medical, dental, pharmaceutical, counseling, geriatric, and obstetric services to all TDCJ inmates. As a member of the Correctional Managed Health Care Committee, she helps formulate policies and procedures for all TDCJ facilities. She is sued in her individual capacity for punitive and compensatory damages. Linthicum is a resident of Walker County, Texas. She can be served with process at 2 Financial Plaza, Suite 652 Huntsville, TX 77340.

15.     Defendant M. Barrera was a Correctional Officer at the McConnell Unit at all relevant times, and acting under color of law and as the agent, and, as a matter of law, the official representative of TDCJ. She is sued in her individual capacity for punitive and compensatory damages.

16.     Defendant CO Garza was a Correctional Officer at the McConnell Unit at all relevant times, and acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. She is sued in his individual capacity for punitive and compensatory damages.

17.     Defendant Mayer was a correctional officer at the McConnell Unit at all relevant times, and acting under color of law and as the agent, and as a matter of law, the official representative of TDCJ. He is sued in his individual capacity for punitive and compensatory damages.

18.     The Texas Department of Criminal Justice is the state prison system, an agency of the State of Texas. At all relevant times, it operated the McConnell Unit, a public facility with

programs and services to Jones and other prisoners with disabilities were otherwise qualified for. TDCJ is a recipient of federal funds. TDCJ is sued for injunctive, declaratory, compensatory, and nominal relief. It can be served with process by serving Bryan Collier, its Executive Director, at 861-B I-45 N., Huntsville, TX 77320.

19.    The University of Texas Medical Branch is a component of the University of Texas system located in Galveston, Texas. UTMB's high-ranking policymakers reside and work in Galveston. Through UTMB's Correctional Managed Care program, UTMB partners with TDCJ to provide health care to 80 percent of TDCJ prisoners, including the prisoners at the McConnell Unit. UTMB  is a recipient of federal funds. UTMB is sued for compensatory relief and injunction. It can be served with process by serving its President, David L. Callender, at 301 University Blvd., Administration Building, Galveston, TX 77555-1006.

## ASTHMA FACTS

## FACTS

### *Extreme Temperatures are Killing Texas Prisoners.*

20.    According to the National Weather Service, "heat is the number one weather-related killer in the United States, resulting in hundreds of fatalities each year." On average, heat kills more people than "floods, lightening, tornadoes and hurricanes combined." One of those victims, Quintero Jones, died at TDCJ's brutally hot McConnell Unit.

21.    Like most other TDCJ prisons, the McConnell Unit's inmate living areas are not air conditioned, and heat index or apparent indoor temperatures routinely exceed 100 degrees.

22.    These temperatures last late into the night, providing no substantial relief to prisoners. Even early in the morning, indoor apparent temperatures are often sweltering.

23.    As each of the individual Defendants have long known and discussed internally at high-

level TDCJ and UTMB leadership meetings well before 2015, temperatures this high cause the human body to shut down. As the body can no longer cool itself, body systems fail. If there is no immediate intervention, extreme temperatures will cause death.

24.      In fact, TDCJ and UTMB incorporate this chart, promulgated by the National Oceanic and Atmospheric Administration (NOAA), into agency policies well before 2015.



25.      The chart shows the heat index, or apparent temperature – the temperature plus the effect of humidity. High humidity can dramatically increase the apparent temperature, the temperature the body "feels."  The heat index in Beeville, Texas on July 31, 2015 reached 110 degrees Fahrenheit at 3:15 p.m.

26.      The indoor apparent temperatures routinely reach the orange "danger" and red "extreme

danger" zones indoors at the McConnell Unit. According to NOAA, when the apparent temperature reaches "extreme danger" heat stroke is "imminent." Yet the Defendants have done nothing to cool the indoor temperatures to protect inmates from death by heat stroke.

27.    It was well known to TDCJ and UTMB leadership, including the Defendants, that people with certain medical conditions, including asthma and hypertension, or who take certain medications, including calcium channel blockers, are much more vulnerable to extreme temperatures.  While these extreme temperatures are punishing and cruel for all prisoners to live with, this heat is especially deadly for people with these medical conditions and disabilities. Their medical conditions prevent their bodies from regulating their temperatures when compared with non-disabled individuals, putting them at much greater risk of death.  Since 2007, approximately twenty-three (23) men have died in TDCJ prisons from heat-related causes, including the following:

| Name | Age | Unit | Date of Death | TDCJ Region | Facts |
|------|-----|------|---------------|-------------|-------|
| Micah "Mike" Burrell | 24 | McConnell | Aug. 1, 2004 | I | Heat Related Asthma Attack |
| James Shriver | 47 | Byrd | Aug. 8, 2007 | I | History of hypertension, prescribed psychotropics |
| Dionicia Robles | 54 | Byrd | Aug. 13, 2007 | I | Prescribed psychotropics, incarcerated less than one |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | II | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | II | Diabetic, prescribed diuretic, found 2:00 am, died 1 week |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | II | History of hypertension, prescribed psychotropics |

| Robert Allen Webb | 50 | Hodge | Aug. 4, 2011 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30 |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | II | Diabetic, prescribed psychotropics, previously complained of heat- related |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | II | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00 |
| Micheal Martone | 57 | McConnell | Aug. 8, 2011 | I | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | IV | Prescribed diuretic, found 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | II | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | McConnell | Aug. 20, 2011 | I | HIV+, prescribed psychotropics, found |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | II | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | IV | Died at transfer facility shortly after arrival, found after |
| Curtis Garland | 36 | Beto | June 23, 2014 | II. | History of Asthma |
| Quintero Jones | 37 | McConnell | 7/31/15 | I. | Asthma, Hypertension, Calcium Channel Blocker Medication |

28.     Particularly, the McConnell unit had a history of multiple prison deaths in extreme heat prior to Quintero Jones's death.

29.     Further, many more prisoners and TDCJ employees working in the extreme heat suffered heat exhaustion and other heat related illnesses.

30.     Many of the TDCJ deaths shared certain characteristics.  The deaths occurred in late July and August – the hottest days of the Texas summer and the prisoners had physical impairments or diseases which made them vulnerable to the searing Texas heat.

31.     Even though ten men died of heat stroke in 2011, high-ranking TDCJ officials did not consider these deaths a serious problem. In fact, in the face of these deaths, TDCJ officials stated TDCJ was doing a "wonderful job" and "[didn't] have a problem with heat-related deaths." Thus,

the individual TDCJ officials took no action to protect future prisoners, like Jones, in the face of TDCJ's obviously inadequate procedures.

32.     Barber's direct supervisors, including Defendants Livingston, Grimes, and Eason were similarly unconcerned. The deaths of prisoners from heat related incidents were regularly discussed at high-level meetings.  Even though the existing policies were inadequate, Livingston, Grimes and Eason, continued to follow the same deadly course of conduct.  Air conditioning the cells at the McConnell Unit or other prisons was never even discussed.  Nor was moving individuals with heat-sensitive medical conditions or disabilities to air-conditioned prisons discussed or implemented.

33.     Even TDCJ's highest ranking medical official, Dr. Linthicum, took no action to protect the patients in her care from the extreme temperatures.  Despite the escalating death toll, she made no changes to TDCJ policy, and failed to provide training to medical staff who needed to appreciate the danger to prisoners exposed to continuous extreme heat.

34.     Nor did Executive Director Livingston take steps to cool the non-air-conditioned prisons – even though prisoners continued to die from extreme temperatures over several years, and deaths from heat related conditions were happening at an alarming rate.  In fact, after 23 deaths– Defendant TDCJ has taken no substantial action to upgrade TDCJ's unairconditioned facilities to protect inmates from these deadly conditions.  See Order of July 19, 2017, called Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, *Cole v. Collier*, Case 4:14-cv-01698.

35.     UTMB executives, including Defendant Dr. Owen Murray, were similarly unconcerned. No changes were ever made to UTMB's policies and screening materials, even as patients under its care died from heat related conditions.  Dr. Murray is responsible  for ensuring that TDCJ

facilities serviced by UTMB provide adequate health care to prisoners, that prisoners have access to adequate health care, for formulating policies to ensure that prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, and that prisoners are not subjected to dangerous conditions as a consequence of their health issues and medical needs.

36.     Despite having the responsibility of ensuring prisoners receive adequate care, Dr. Linthicum and Dr. Murray, on behalf of UTMB, have been grossly derelict and deliberately indifferent when it comes to protecting inmates vulnerable to the heat.   In fact, Dr. Linthicum and Dr. Murray know that extreme heat above 90 degrees indoors is harmful medically and potentially lethal to prisoners such as Quintero Jones, who suffered from asthma, hypertension, and who was taking Calcium Channel Blocker medication.   Dr. Linthicum, as TDCJ's chief medical officer, and Dr. Murray, as the chief physician for UTMB concerning correctional care, knew that prisoners with such conditions are endangered if placed into brutally hot conditions.

37.     Dr. Linthicum and Dr. Murray have long known TDCJ does not air condition most inmate living areas.   Dr. Murray has even given press tours in which he described cells as "blazing hot" in summer and "bitter cold" in winter.   Moreover, as part of their duties as director of TDCJ's medical care program and head of correctional care for UTMB, Dr. Linthicum and Dr. Murray have personally examined nearly all of the facilities they are responsible for providing care to and, upon information and belief, have visited the McConnell Unit.   Linthicum and Murray are also, of course, well aware of the extremely hot and humid conditions that regularly present themselves each summer in Texas.   Dr. Linthicum and Dr. Murray were thus aware that in July 2015, the McConnell Unit's housing areas were extremely hot and dangerous for individuals like Quintero Jones.

38.     For TDCJ to make a necessary capital improvement like air conditioning the prisons,

action by the most senior TDCJ officials, including Defendant Livingston, would have been needed. Despite prisoners continuing to die from extreme temperatures, Livingston failed to take effective action to upgrade TDCJ's facilities to protect inmates such as Quintero Jones from these deadly conditions.

39.     These hazardous conditions, blazing heat without air conditioning, served no penological purpose.

***TDCJ Denied Jones Safe Housing.***

40.     Defendants TDCJ, Livingston, Barber, Grimes, Eason, Linthicum, and Murray chose not to take any action to house prisoners in safe conditions, even though they knew many prisoners had medical conditions that made the extreme heat in the McConnell Unit deadly.

41.     Air-conditioned housing was available at some TDCJ prisons, but not the McConnell Unit. Of the 97 state-operated TDCJ prisons, some 56 have some air conditioning in inmate living areas. Ironically, solitary confinement cells (including death row) are routinely air conditioned.  While inhumane heat conditions are never justified, it is ironic that prisoners who obediently serve their time do not receive relief from the extreme heat, while prisoners who are allegedly combative, assault staff, or are sentenced to death, live in safer conditions because of air conditioning.

42.     Of course, office areas like Livingston, Barber, Grimes, Eason, Linthicum, and Murrays' offices are air conditioned.

43.     At the time of Quintero Jones's death, despite having known the dangers temperatures above 90° Fahrenheit posed to prisoners, TDCJ and UTMB policies only provided protections from heat to inmates who performed outdoor prison labor.  If a prisoner suffered from heat-sensitive conditions, they could not "work or recreate in environments where the apparent air

temperature is 95° F or higher."   TDCJ and UTMB's policies, however, made *no* accommodations for prisoners' housing assignments, or locations they were required to live in, even though temperatures in living areas routinely reach the "danger" and "extreme danger" zone. TDCJ and UTMB policy only addressed preventing heat-related injuries "in the workplace."

44.     Similarly, Dr. Murray and UTMB had formulated work policies designed to minimize possible heat exhaustion and heat stroke among inmates.  However, despite knowing that medically vulnerable inmates spend most of their time inside, and despite knowing that indoor temperatures at the McConnell Unit and other prisons routinely exceed 100 degrees in the summer, Dr. Linthicum and Dr. Murray had not instituted any practice or policy concerning safely housing inmates known to be especially vulnerable to the heat, such as Quintero Jones.

45.     UTMB made mandatory housing recommendations to TDCJ for some prisoners with disabilities – a prisoner using a wheelchair, for example, could not be assigned to a top bunk. But UTMB and TDCJ policies did not contemplate special or safe housing for prisoners with heat-sensitive disabilities.

46.     Significantly, Defendants chose prior to Jones's death not to provide prisoners at the McConnell Unit, including Jones, opportunities to cool off in an air conditioned environment. Though some parts of the McConnell Unit were air conditioned and available to use as a respite area, such as the visitation rooms, prisoners were not given the opportunity to cool off prior to the death of Quintero Jones.

47.     As a consequence, inmates with asthma and hypertension like Quintero Jones were placed at high risk of dangerous aggravation of disabilities in the major life activity of breathing.

48.     Even though from 2007 to the present, at least twenty-three inmates have died due to

extreme heat inside prison dorms that are not air conditioned or otherwise cooled, Defendants made no effective changes to their policies or procedures. Despite the fact that inmates had suffered from an alarming rate of heat-related incidents, including deaths, Linthicum, Murray and UTMB had taken no effective action to try to protect the weakest inmates TDCJ houses.

49.     And despite the fact that multiple prisoners have died from heat related incidents, TDCJ officials said publicly they consider adding any air conditioning to TDCJ's prisons a waste of money.

**People with Certain Medical Conditions Such As Jones Suffered From are Especially Vulnerable to Extreme Temperatures.**

50.     TDCJ and UTMB's policies and procedures recognized heat stroke as well as asthma attacks as "medical emergencies" where delay can be fatal.

51.     TDCJ and UTMB policies specifically acknowledge certain medical conditions, like asthma and hypertension affect heat tolerance.

52.     Unfortunately, many TDCJ inmates suffered from these conditions, including Jones.

53.     TDCJ and UTMB officials, including Livingston, Barber, Grimes, Eason, Linthicum, and Murray knew prisoners in TDCJ custody suffered from these disabilities with the major life-activity of breathing, and were at increased risk of heat-related injury or death.

**Corrections Officers and Nurses at the McConnell Unit are Inadequately Trained.**

54.     Because the apparent temperatures were so high, it was imperative TDCJ and UTMB's low-level employees recognize heat-related illnesses and get prisoners emergency medical care quickly. The training TDCJ and UTMB provided the officers and nurses responsible for day-to-day supervision of prisoners, however, was grossly inadequate.

55.     UTMB and TDCJ medical staff were not involved in teaching line officers and nurses to identify heat-related illness – even though when a prisoner needed medical care, the low-level

officers and nurses were the gatekeepers standing between the prisoner and a doctor. Instead, the prison training circular focused on <u>employees</u> staying hydrated. Large portions of a 2010 circular even discussed preventing heat-related illness in <u>pets</u>.

56.     As the Warden and Regional Director, Barber and Grimes are directly responsible for training the front-line officers charged with protecting prisoner's lives. Linthicum and Murray are similarly responsible for training the nurses who staff UTMB's infirmaries. Livingston, Barber, Grimes and Eason were ultimately responsible for ensuring all TDCJ corrections officers receive adequate training. Each failed to provide adequate training and supervision, and many people including Quintero Jones, died as a consequence.

**In 2004, Heat Related Asthma Attack Kills Prisoner Michael Burrell at the McConnell Unit.**

57.     Presaging the events that led to the death of Quintero Jones in 2015, on Aug 1, 2004, Prisoner Michael Burrell was in his cell at the McConnell Unit and when he experienced an asthma attack. His fellow prisoners called for help. Prison staff delayed in arrival. Once they arrived, prison staff failed to call for immediate medical assistance. An ambulance was ultimately called, but prisoner Burrell suffocated and died from this heat related asthma attack.

**When Men Died in 2007, TDCJ and UTMB Failed to Make Changes and Prisoners Died as a Consequence.**

58.     Two TDCJ and UTMB victims died at TDCJ's Byrd Unit in 2007. The first prisoner to die, James Shriver, arrived at the Byrd Unit less than 24 hours before his death. Though he had served several years in prison, he came to Byrd on the afternoon of August 7, 2007 from a TDCJ inpatient, mental-health facility that was air conditioned. That day the apparent temperature reached 105 degrees. Shortly before 5:00 am the next day, officers found him dead in his cell.

59.     Less than a week later, Dionicio Robles died of heat stroke at the Byrd Unit. He also came to the Byrd Unit from a TDCJ inpatient mental health facility that was air conditioned. He arrived at the Byrd Unit on August 3, 2007, and was dead less than ten days later. The day he died the apparent temperature topped 106 degrees. He was also found dead in his cell shortly before 5:00 am.

60.     Though Mr. Shriver and Mr. Robles were known to suffer from heat- sensitive medical conditions similar to Jones's disabilities, no measures were taken to protect them from the extreme indoor temperatures common in TDCJ prisons.

61.     Alford supervised TDCJ operations at the Byrd Unit, and would have been well aware that two men died there from heat stroke in 2007. Despite this, he took no action to ensure other men in the prisons he supervises suffered a heat- related illness or death.  Jones also knew about these deaths.

62.     Mr. Shriver and Mr. Robles' deaths should have been a wake-up call to TDCJ and UTMB officials – including Livingston, Barber, Grimes, Eason, Linthicum, and Murray. But even though two men with serious disabilities died under extremely similar circumstances, TDCJ made no changes to operations to protect the lives of vulnerable prisoners in the future.  Rather, they continued to operate TDCJ while exposing individuals in its care to temperatures they knew endangered human life.

63.     Similarly, after the two men died in 2007, Dr. Murray instituted no changes to UTMB's intake and housing practices, and continued to leave vulnerable prisoners at risk of heat stroke system-wide.

64.     In August 2008, Eugene Blackmon, an elderly man suffering from hypertension, sued concerning the extreme heat he endured at a TDCJ prison. UTMB and TDCJ officials at the

highest levels were involved in TDCJ's defense, but still made no changes.

**As Men Died in 2011, TDCJ and UTMB Still Failed to Make Changes And Prisoners Died As a Consequence.**

65.     On July 22, 2011, Larry Eugene McCollum died of heat stroke. He was found unresponsive in his bunk at the Hutchins Unit, a TDCJ prison near Dallas. He was hospitalized at Parkland Hospital until life-support was withdrawn on July 28, 2011.

66.     Shortly after Mr. McCollum's heat stroke, Douglas Hudson was found unconscious, having a seizure in his cell at the Gurney Unit on July 24, 2011. He received medical attention at the prison, and his body temperature was 105 degrees. He was eventually flown by helicopter to Palestine Regional Medical Center, but died of heat stroke on July 25, 2011.

67.     A few days later, on August 3, 2011, Thomas Meyers died at the Coffield Unit after suffering a heat stroke. Mr. Meyer's body temperature was 105.6 degrees when he received medical attention.

68.     The next day, Robert Allen Webb, 50, died at the Hodge Unit. Mr.
Webb suffered from developmental disabilities and asthma, and was prescribed medication that made him very susceptible to heat stroke.

69.     Later that week, Alexander Togonidze, 44, died of a heat stroke at the Michal Unit. Mr. Togonidze had been seen for heat-related medical problems due to his diabetes and mental illnesses each summer he was in TDCJ custody, but was not provided any accommodations.

70.     Earlier the same day Mr. Martone died, Charles Cook, 53, was found dead in his cell after suffering a heat stroke at TDCJ's Hodge Unit.

71.     Throughout the rest of the summer, four more men, all suffering from similar disabilities known to make them vulnerable to extreme heat, died from heat stroke in TDCJ's prisons.

**TDCJ and UTMB Officials at the Highest Levels Knew About these Deadly Conditions.**

72.    Livingston, Barber, Grimes, Eason, Linthicum, Murray, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 90 degrees during the hot Texas summers, but failed to take reasonable steps to protect the health and safety of prisoners.

73.    Livingston, Barber, Grimes, Eason, Linthicum, and Murray all knew inmate living areas at the McConnell Unit were not air conditioned, and that the apparent temperatures routinely skyrocketed over 100 degrees during the hot Texas summers.

74.    At all relevant times, Livingston, Barber, Grimes, Eason, Linthicum, and Murray knew that extreme temperatures could be deadly. But they, as well as UTMB, also knew TDCJ routinely housed people with high blood pressure, asthma and other breathing difficulties in extremely hot facilities like the McConnell Unit.  Moreover, TDCJ's policies and practices, which Livingston, Barber, Grimes, Eason, Linthicum, and Murray knew about, made no accommodation for people disabled in the fundamental life activity of breathing.

75.    Murray and other UTMB executives knew Texas summers are extremely hot – and that temperatures inside the prisons remain "blazing" high for weeks on end.

76.    Additionally, Livingston, Barber, Grimes, Eason, Linthicum, and Murray were aware that daily temperature readings were taken at the prison and that these readings were routinely above 90° during the summer months.  Incredibly, despite their knowledge of these dangers, TDCJ and UTMB had no policy concerning protecting prisoners from extreme heat in indoor housing areas, and no policy to cool the dangerously hot living areas.

77.    Instead of having a formal policy, TDCJ relied on an informal email sent by prison officials that acknowledges the dangers of heat to prisoners, but that does not protect a prisoner with heat-sensitive medical conditions from extreme temperatures.  Instead, it relied on measures

that proved inadequate when the men died in 2007, like increasing water intake and providing additional fans, neither of which cooled the inside temperature to reduce the danger.

78.     The email is also recycled each year – the text is virtually identical, and has not changed even after men began to die. Prison Officials knew the measures described in the email were inadequate, but took no action prior to the death of Quintero Jones to improve TDCJ's response to heat-related emergencies.

79.     High-level TDCJ officials have also been sued before about these conditions. In the seminal Texas prison reform case, the *Ruiz* class action, the Southern District observed prisoners were dying of heat-related causes as far back as 1999.  *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).  More recently, in Memorandum and Opinion Setting Out Findings of Fact and Conclusions of Law, *Cole v. Collier*, Case 4:14-cv-01698 this Court enjoined the State of Texas to provide medically vulnerable prisoners, including asthmatics and those with hypertension, with air-conditioned environments.

80.     Among other lawsuits, the present Executive Director of TDCJ, Bryan Collier, was a named defendant in *Blackmon v. Kukua*.  In *Blackmon*, Collier filed an answer making specific admissions and denials in April 2010, and admitted "the dorm areas where the inmates are housed [at Mr. Blackmon's prison] are not air conditioned."  Mr. Blackmon complained he was exposed to apparent temperatures that reached 130° indoors at the Garza East Unit.  *Blackmon* went to trial in February 2011, just a few months before Michael Martone died at the McConnell Unit on August 8, 2011.  While Collier settled the *Blackmon* lawsuit for money damages, he continued to expose prisoners, including those with heat sensitive disabilities like Martone, and then Quintero Jones to extreme heat inside prisons.

81.     High-ranking UTMB officials were also dismissive of the *Blackmon* suit.  Dr. Charles

Adams, a chief UTMB physician and Murray's deputy, testified the extreme temperatures did not violate Mr. Blackmon's rights, flippantly saying "to be honest with you, I never expected this to go to trial and after I wrote [my] report [on the case], I pretty much threw it away."  In other words, Murray and UTMB – in the face of people dying from heat related causes at alarming levels – continued to ignore the problem and kept prisoners in grave danger.

82.     Murray was well aware of this and agreed with Dr. Adams despite knowing about the dangers extreme heat posed.  As a result, UTMB providers at all prisons, including the McConnell Unit, continued to house inmates vulnerable to the heat in dangerously hot temperatures during the summer months without any housing restrictions.

83.     In fact, after twenty-three people have died from heat stroke and related illnesses in TDCJ units in which UTMB provides health care, Linthicum, Murray and UTMB continued to turn a blind eye and expose the most vulnerable to dangerous extreme heat inside the prison.

84.     As the conditions at the McConnell Unit are long-standing, well- documented, and expressly noted by prison officials in the past, Defendants knew subjecting prisoners, like Jones, to the obvious risk of prolonged exposure to high ambient temperatures and humidity, posed a life-threatening health risk.  Yet, rather than seek to have the housing areas cooled by air conditioning or temporary cooling system/unit, or to make sure inmates with serious asthmatic illnesses were housed in air conditioned units, these officials chose to subject all inmates to dangerous, extreme heat.  A decision, of course, they made from the comfort of their own air conditioned offices.

85.     TDCJ's Emergency Action Center generates reports that track heat- related injuries and deaths system-wide.  High-ranking officials Livingston, Barber, Grimes, Eason, Linthicum, and Murray routinely review the EAC reports generated at the facilities they supervise. These reports

would have shown them prisoners and staff were suffering heat-related disease and injuries every summer at the prison.

86.    UTMB, TDCJ, Livingston, Barber, Grimes, Eason, Linthicum, and Murray – at a minimum – failed to take reasonable steps to safely house prisoners at the McConnell Unit and protect them from heat related conditions, including asthma and hypertension, a risk they were well aware of at the time. Livingston, Barber, Grimes, Eason, Linthicum, and Murray were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

87.    Meaningfully addressing these conditions would require action at the highest levels of the agency, including authorization and approval from Livingston and Eason. They refused to act, authorize or otherwise approve effective actions to address these conditions.

88.    UTMB, TDCJ, Livingston, Barber, Grimes, Eason, Linthicum, and Murray – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the McConnell Unit and protect them from heat heat aggravated conditions such as asthma and hypertension, a risk they were well aware of at the time. Livingston, Barber, Grimes, Eason, Linthicum, and Murray were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.

89.    Despite the epidemic of heat-related deaths, the Defendants have refused to act, authorize or otherwise approve actions to effectively address these conditions.

90.    At the time of Jones's death, the law was clearly established that temperatures in confinement exceeding 90° are cruel and unusual, and create unconstitutional conditions of confinement. Thus, Livingston, Barber, Grimes, Eason, Linthicum, and Murray are not entitled to qualified immunity.

91.    Plainly, the conditions at the McConnell Unit result in gratuitous pain and suffering for

all prisoners, and posed an imminent danger of serious physical illness, injury, or death to Jones, as well as the prisoners who are incarcerated there today. These conditions are not reasonably related to any penological interest.  Rather, they endanger the lives of the weakest, sickest, prisoners in TDCJ custody.

**Jones was Disabled.**

### *Hypertension*

92.     Jones suffered from hypertension.  Hypertension is a cardiovascular disease.  It is the leading cause of stroke, and a major cause of heart attacks.  Serious damage is caused to the cardiovascular system when blood flow asserts high pressure on artery walls.  Hypertension is often called "the silent killer."  It can cause breathing problems, and result in organ damage, if untreated. Hypertension can also cause severe headaches, fatigue, obesity, and vision problems. Hypertension is a physiological condition affecting body systems, including the respiratory and cardiovascular systems.

93.     As Defendants well knew, hypertension itself also increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature.

94.     Calcium Channel blockers are also used to treat hypertension. TDCJ considers this medication as potentiator for increased risk of heat stroke and heat related illnesses.  By D-27.2 Attachment A to its "Heat-Related Illness Reporting Form" Calcium Channel Blockers are drugs associated with Heat Stress.

95.     As one would expect, hypertension substantially limits one's ability to walk, stand, and breathe, and limited the operation of one's respiratory, circulatory, and cardiovascular systems.

96.     UTMB prescribed Calcium Channel Blocker Amlodipine to treat Jones's hypertension but otherwise failed to afford Jones reasonable accommodation for his disability.

### Asthma

97.     Quintero Jones suffered from severe asthma.  Asthma is a condition in which a person's airways become inflamed, narrow and swell, and produce extra mucus, which makes it difficult to breathe. It's well understood that heat and exercise increase the likelihood of an asthma attack. Asthma is a serious medical condition which if left untreated can be debilitating and even fatal. With proper preventative management and timely treatment a person can live full and productive life.

98.     Jones had been prescribed through his incarceration Proventil for his asthma.  In fact, it had been ordered that it be "KOP" or Keep on Person.  Proventil (albuterol) is a bronchodilator that relaxes muscles in the airways and increases air flow to the lungs.  Proventil HFA is used to treat or prevent bronchospasm in people with reversible obstructive airway disease.  It is also used to prevent exercise-induced bronchospasm.

### Disability Discrimination

99.     TDCJ and UTMB officials, including Livingston, Barber, Grimes, Eason, Linthicum, and Murray, knew that many prisoners with asthma and hypertension lived in Texas prisons.

100.    Here, TDCJ and UTMB discriminated against Mr. Jones, by denying him reasonable accommodations necessary to allow him access TDCJ and UTMB's programs and services.  The extreme heat in TDCJ facilities denies people like Mr. Jones access to TDCJ facilities and safe housing.

### Jones's Death

101.    At the time of his death, Jones was Thirty-seven.

102.    He had been diagnosed with asthma and hypertension.  He was seen for asthma attacks as recently as June 5, 2015 and on July 28, 2015 he was seen for difficulty breathing.  At the time of Quintero Jones's death, he had been prescribed daily use of hypertension medication, Amlodipine; as well as Proventil at least four times a day, and as needed for emergencies.

103.    At approximately 8:45 a.m. on July 31, 2015, Defendant Corrections Officer Martha Barrera took Quintero Jones's prescribed Proventil inhaler in violation of the standing order that it be KOP or kept on person.  Jones was to take two puffs four times a day to prevent his asthma from flaring up.  That date was brutally hot with the heat index reaching 110 degrees making the need for preventative treatment ever so more vital.  Jones was confined to his sweltering cell throughout the day as the prisoners were on a semi-annual lockdown.

104.    When Jones was walking back to his cell, he told Defendant Corrections Officer Garza that his inhaler was taken at the "shake down" and that he needed it because he was having breathing problems.  Jones asked Defendant Garza to please call medical so he could get a breathing treatment and a new inhaler right away.  Instead of calling medical, Defendant Garza told Jones to "fill out an I-60 form" requesting a medical appointment and to drop it in the box, knowing full well that Jones's request for medical attention would not even be picked up by medical until the next day.  It was well known to Garza and other correction officers, that Jones suffered from severe asthma which could be extremely dangerous and required immediate attention, and that Jones had a "keep on person" order related to his inhaler that had been confiscated by Defendant Barrera.  In fact, Jones had suffered from an asthma attack requiring treatment on June 5, 2015, and had gone to the infirmary complaining of difficulty breathing three days prior to his death, on July 28, 2015.

105.    On July 31, 2015, the Beeville area experienced a temperate of 98 degrees.  That day, the

heat in the McConnell Unit was sweltering – a high of 98 degrees Fahrenheit, with up to 100 percent humidity.  The heat index, the combination of temperature and humidity, made the air temperature feel like it was near 110 degrees.  According to TDCJ's heat matrix, these temperatures are a "danger" to prisoners, and called for "extreme caution."

106.    On July 31, 2015, Quintero Jones was experiencing a severe asthma attack.  Jones was laying on the floor of his cell to stay away from the baking hot cinderblock walls.  Defendant C.O. Mayer came over and looked into Jones's cell, but ignored pleas for help.  Instead Defendant C.O. Mayer walked away and took other inmates back and forth to the showers. During this time, Jones's cellmate, shouted "MAN! HE'S HAVING AN ASTHMA ATTACK! YOU NEED TO COME HELP!!" and began kicking the door "OFFICER! OFFICER! HE'S DYING! COME ON!"  Inmates in adjacent cells joined in banging the doors and shouting. Defendant C.O. Mayer ignored these calls for help for an extended period of time, up to 20 minutes.  When Mayer finally returned to Jones's cell, Jones was hunched over on the floor and gasping for air.

107.    Finally, Corrections Officer Mayer called for medical over the walkie talkie radio.  After further delay, Sgt. Salinas came to the cell with Officer Munoz.  At that point, the Corrections Officer Munoz and the Sgt. Salinas rolled the cell door open and with one on either side of him, they lifted Quintero Jones under his arms up to make him walk.  A request was made that they should get a wheelchair.  Once Quintero Jones was out in the hallway, Jones could not walk, and they slumped him over the railing in front of his cell while he gasped for breath, began vomiting and finally fell to the floor.  Sgt. Munoz flashed his flashlight into Jones's face, and then began pushing on his chest to attempt to get him to breathe.  Other prisoners shouted out to Quintero Jones to "fight it" and not to die.

108.    A nurse, G. Samuel, finally arrived at the scene at 7:23 p.m.   The nurse walked past Quintero Jones who was collapsed in front of cells 9-10.   The nurse eventually returned with an AED which showed no need to shock Quintero Jones.   CPR and chest compressions continued over the next 24 minutes but no independent heart rhythm was established.   He was then transported to the hospital where he was pronounced dead.

109.    The Autopsy specifically revealed Quintero Jones died on July 31, 2015, of "exacerbation of asthma."

## CAUSES OF ACTION

## EIGHTH AND FOURTEENTH AMENDMENT CLAIMS

110.    Plaintiffs incorporate the previous paragraphs as if alleged herein, and further plead:

111.    By subjecting Jones to these extreme conditions of confinement, specifically depriving him of his emergency breather and keeping him in excessive heat, with full knowledge of the dangerousness of those conditions, individual Defendants, C.O. Barrera, C.O. Garza, and C.O. Mayer, acted with deliberate indifference Quintero Jones's serious health and safety needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

112.    The deprivation of Jones's emergency breather and the extreme temperatures Defendants tolerated at the McConnell Unit proximately caused Jones's untimely death.

113.    Further, individual Defendants from UTMB are responsible for making sure that TDCJ and UTMB's practices and policies do not endanger the lives of the patients treated by UTMB providers.   Despite knowing that many prisoners suffer from conditions and take medications — that make them vulnerable to the heat and endanger their lives in periods of extreme heat, individual Defendants from UTMB failed to place any restrictions on prisoner housing during

periods of extreme heat.  Additionally, they failed to train UTMB staff about the dangers extreme heat posed to prisoners, and especially to prisoners like Jones who suffered from asthma and high blood pressure.  As Dr. Linthicum and Dr. Murray were subjectively aware of the danger their actions posed to prisoners in Jones's condition, and were aware that many prisoners had died from heat related incidents prior to Jones's death, they were deliberately indifferent to the serious medical needs of prisoners like Jones and their actions were a proximate cause of Jones's death.

114.    Plaintiffs bring these claims through 42 U.S.C. §1983.

## AMERICANS WITH DISABILITIES ACT AS AMENDED AND REHABILITATION ACT
### (As to Defendants TDCJ and UTMB Only)

115.    TDCJ and UTMB have been, and are, recipients of federal funds, and thus covered by the mandate of the Rehabilitation Act.  The Rehabilitation Act requires recipients of federal monies to reasonably accommodate persons with disabilities in their facilities, services, programs, or activities and reasonably modify such facilities, services, programs or activities to accomplish this purpose. 29 U.S.C. §794.

116.    Further, Title II of the ADA, the Americans with Disabilities Act Amendments Act ("ADAAA") apply to TDCJ and to UTMB and have the same mandate as the Rehabilitation Act. 42 U.S.C. §§12131 et seq.

117.    Title II of the ADA and the ADAAA protect prisoners with disabilities because exposure to extreme temperatures actually violates the Eighth and Fourteenth Amendments of the U.S. Constitution.

118.    The McConnell Unit is a facility, and its operation comprises services, programs or activities of TDCJ and UTMB for Rehabilitation Act, ADA, and ADAAA purposes. Quintero Jones was otherwise qualified to receive the services of and participate in the programs

or activities provided by TDCJ and/or UTMB at the McConnell Unit.

119.    For purposes of the ADA, ADAAA, and The Rehabilitation Act, Quintero Jones was a qualified individual with and known to have a physical impairment that substantially limited one or more of his major life activities, including breathing.  Defendants TDCJ and UTMB knew Jones suffered from asthma and hypertension, and was prescribed medications to treat his disabilities.  Despite this knowledge, TDCJ's officers and UTMB's employees intentionally discriminated against him, under the meaning of the ADA, ADAAA and Rehabilitation Act, by failing and refusing to accommodate his disabilities and protect him from the danger of being deprived of his emergency breather and then subjecting him to the extreme temperatures that took his life.

120.    As alleged above and herein, TDCJ and UTMB failed and refused to reasonably accommodate Jones, in violation of the ADA, ADAAA and Rehabilitation Act.  That failure and refusal caused his death.

121.    As alleged above, TDCJ and/or UTMB failed and refused to reasonably modify its policies, practices or procedures to ensure Quintero Jones access to the facilities, services, programs or activities of the McConnell Unit by reasonably accommodating his disabilities. These failures and refusals caused his death.

122.    Jones died as a direct result of TDCJ and UTMB's intentional discrimination. Plaintiffs are entitled to the maximum amount of compensatory damages allowed by law.

## DAMAGES

123.    Plaintiffs are entitled to compensatory, punitive, presumed, and nominal damages against the individual Defendants in the maximum amounts allowed by law.

124.    Plaintiffs are entitled to compensatory damages against TDCJ and UTMB in the

maximum amounts allowed by law.

125.    As the actions and omissions of Defendants, their agents, employees, and/or representatives, proximately caused and/or were the moving force of the injuries and damages to Plaintiffs and were the moving force of Quintero Jones's wrongful death,   Plaintiffs assert claims under the United States Constitution and 42 U.S.C. §1983, the ADA, ADAAA, and Rehabilitation Act and the wrongful death and survivorship statutes as specifically pled herein.

126.    More particularly, Plaintiffs, in their capacities as heirs to the Quintero Jones, assert a survival claim on behalf of Quintero Jones, including but not limited to, the following:

- physical pain and mental anguish of Quintero Jones;

- funeral and/or burial expenses; and

- attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, ADAAA, and Rehabilitation Act or as allowed by law.

127.    Plaintiffs, in their capacity as wrongful death beneficiaries have incurred damages including, but not limited to, the following:

    i.    past and future mental anguish;

    ii.    past and future loss of companionship, society, services, and affection of Quintero Jones; and,

    iii.    attorneys' fees and costs pursuant to 42 U.S.C. §1988, the ADA, ADAAA, and Rehabilitation Act, or as allowed by law.

### ATTORNEYS' FEES AND COSTS

128.    Pursuant to 42 U.S.C. §1988, Plaintiffs are entitled to recover attorneys' fees and costs. Plaintiffs also requests attorneys' fees, costs, and expenses against TDCJ and UTMB for the ADA, ADAAA, and Rehabilitation Act claims, pursuant to 42 U.S.C. §12205 and 29 U.S.C. §794a.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs request that the Court:

A.      Award compensatory damages, nominal and presumed damages against Defendants to Plaintiffs;

B.      Award punitive damages against the individual Defendants only under Section 1983, and the Wrongful Death Act, and through the Survival Statute, to the Plaintiffs;

C.      Find that Plaintiffs are the prevailing parties in this case and award their attorneys' fees, court costs, expert costs, and litigation expenses; and,

D.      Grant such other and further relief as appears reasonable and just, to which Plaintiffs may be entitled.

Respectfully submitted,

THE SCHULMAN LAW FIRM, P.C.

*/s/John E. Schulman*
John E. Schulman
SBN 17833500
Southern District of Texas Bar No.: 6959
jschulman@schulmanlaw.com
6440 North Central Expressway, Suite 210
Dallas, Texas 75206
214-361-2580 telephone
214-361-6580 facsimile

**ATTORNEY IN CHARGE**